UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

JESSIE SHANNON TERRY                    CIVIL ACTION NO. 08-cv-1306

VERSUS                                  JUDGE HICKS

BOSSIER MEDIUM SECURITY                 MAGISTRATE JUDGE HORNSBY
FACILITY, ET AL

**REPORT AND RECOMMENDATION**

**Introduction**

Jessie Shannon Terry ("Plaintiff") is a convicted state prisoner who was housed for several months at the Bossier Parish Medium Security Facility. Deputy Brian Goff accused Plaintiff and some other inmates of gambling. Plaintiff denied the accusation, but a strip search revealed torn playing cards that inmates use as gambling chips. Goff seated Plaintiff on a bed in a cell, and Goff was talking to Plaintiff about the rule violation when Goff struck Plaintiff a number of times. Plaintiff alleges that Deputies Trace Smith and Rusty Murray, who were nearby, also struck him.

Plaintiff contends that the force was unprovoked. Goff responds that he used the force only because Plaintiff reached for him in an aggressive manner and in violation of a rule that an inmate in the presence of an officer must keep his hands behind his back. Smith and Murray contend that they never touched Plaintiff. Plaintiff claims that the use of force caused him pain and suffering, including headaches that began months later.

Motions for summary judgment did not resolve the case. No party made a proper and timely jury demand, so a hearing was held before the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B). Based on the evidence received at the hearing, and the credibility and weight assessments discussed below, it is recommended that Plaintiff's claims be dismissed and judgment be entered for the defendants.

**Excessive Force**

Whether an Eighth Amendment excessive force claim has been made depends on whether the "force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 112 S.Ct. 995 (1992). The factors to be looked to include (1) the extent of the injury suffered, (2) the need for the application of force, (3) the relationship between the need and the amount of force used, (4) the threat reasonably perceived by the responsible official, and (5) any efforts made to temper the severity of a forceful response. Gomez v. Chandler, 163 F.3d 921, 923 (5th Cir. 1999).

**The Evidence**

    **A. Plaintiff's Testimony**

Plaintiff testified that he and five other inmates were in fact gambling when Deputy Goff walked in and told all six men to leave the cell. Deputies Smith and Murray came to the area and told the men to face the wall. Goff later told them to turn around and put their cards and chips on the floor. Plaintiff says the men did so. A couple of the inmates

made some odd sounds or other form of disturbance, and Smith and Murray were said to have "roughed them up" and removed them from the area.

Plaintiff somewhat glossed over whether he admitted gambling at that time or turned in what he believed were all his chips. He testified that Deputy Goff confronted him with a comment that Plaintiff thought he was slick. Plaintiff was ordered to strip. Plaintiff testified that two chips were found in his sock, which Plaintiff said he suspects must have stuck to his leg. Plaintiff did not say whether he turned in any other chips or otherwise explain why he had chips in his sock.

Plaintiff was directed to an isolation cell. He testified that when he entered the cell, Goff, from the doorway, ordered Plaintiff to sit on the bed with his hands behind his back. All three deputies then entered the cell and shut the door. Goff got in Plaintiff's face and asked, "Do you think I'm dumb or crazy?" Before Plaintiff could answer, Plaintiff testified, Goff began "throwing licks" at Plaintiff.

Plaintiff testified that he did not see Smith or Murray hit him, but he nonetheless "knows" that more than one person had to have been hitting him. Plaintiff said that the beating lasted for three to five minutes and involved 10 or 20 blows. Plaintiff later said he was unsure about the exact number of blows. He testified that he "wanted to say" that all of the blows were made by a closed fist and none "to my knowledge" were made by open-hand strike. Plaintiff testified that the beating ended only when Plaintiff claimed that he had a brain tumor. (Plaintiff admitted that he did not have a brain tumor, but he said that his

mother and younger brother died from them.) Plaintiff testified that Goff said, as he left the cell, "You stupid ass nigger. I should kill your black ass." Goff returned about six hours later, returned Plaintiff's clothing, and took the entire the group of gambling inmates back to the dorm area.

### B. Warden Gray

Warden Charles Gray testified that he was the warden of the medium security facility at the time of the incident. (He has since been promoted to manager of all corrections.) He was not on duty at the time of the use of force, and he does not recall ever talking to Plaintiff directly. He did have some recollection of a conversation with Plaintiff's mother about the adequacy of Plaintiff's medical care.

Warden Gray testified that the deputies at the facility are trained according to POST rules, and they follow guidelines set by the Department of Corrections for handling convicted DOC inmates such as Plaintiff. Deputies Goff, Smith, and Murray were so trained.

Warden Gray explained that it is policy in the Bossier Parish facility that an inmate is required to place his arms behind his back when being escorted or moved by a deputy. The requirement is for the safety of the deputies. Plaintiff questioned why handcuffs could not be used. Gray explained that it would not be feasible because too many inmates are frequently moved, so it would require many sets of handcuffs and additional time to apply and remove the cuffs.

Warden Gray explained that the inmate handbook classifies gambling as a minor violation. The penalty for a minor violation might include the deputy writing a report and delivering it to a supervisor, which can lead to a disciplinary process. Alternatively, the deputy may directly confine the inmate to isolation or return him to his cell. Thus, the deputy has discretion to handle a minor violation formally or informally.

Warden Gray testified that facility policy directs a deputy to make a written report any time there is a use of force, but he did not receive a report regarding the incident at issue. Gray said a report should have been written. The three defendant deputies each conceded that policy required a written report regarding the use of force, but no report was prepared. None of the three deputies offered any explanation for the omission.

### C. Deputy Brian Goff

Deputy Brian M. Goff testified that he began working at the jail in March 2008, just a few months before the August 2008 incident. On the day of the incident, Goff saw five or six inmates gambling. He confronted them, and all but Plaintiff admitted guilt. The inmates were taken to the isolation area, but Plaintiff was separated and strip searched. Gambling chips cut from cards were found in his sock.

Deputy Goff admitted that he was "frustrated" with Plaintiff for lying. He conceded that he could have counseled Plaintiff about the violation from a distance, but he chose to get close to Plaintiff. Goff, who stands about 5'9" tall and weighs about 135 pounds, chose to enter the cell and get "face to face" with Plaintiff, whose booking records listed him at 5'11"

and 320 pounds. Goff recalled at the hearing that Plaintiff was leaned back toward the wall with his arms behind him, and Goff was "bent over pretty close" to Plaintiff. Goff gave similar testimony in his affidavit that Plaintiff was sitting with his back against the wall, and Goff stood "next to him bent over so that he could be face to face" with Plaintiff to chastise him for his gambling violation and related lying.

Deputy Goff denied that he used any racial slurs. He admitted that he "might have" called Plaintiff a "stupid motherfucker." He conceded that this was not the way he was taught to "counsel" inmates. Goff testified that, during the confrontation, Plaintiff never touched him but did remove his arms from behind his back and reach toward Goff in an aggressive manner. Plaintiff had a look on his face of "anger and defiance." Goff responded by making two to three open-hand strikes to Plaintiff's facial area. All of the blows were struck with Goff's right hand, and Plaintiff leaned to his right, away from the direction of the blows. The last blow landed as Plaintiff began to lean over.

Goff explained that an open-hand strike is made with the hand completely open. It differs from a slap, in which contact is made primarily with the finger area, in that the palm of the open hand makes primary contact. He said the strikes were used in this case to control the situation and create distance between him and Plaintiff.

Plaintiff asked Goff at the hearing if he had hit Plaintiff on the top of the head. Goff responded by asking how it would be possible for him to have done so from their relative positions. Plaintiff then pointed out that Goff testified in his summary-judgment affidavit

that he made strikes to the side and top of Plaintiff's head, as well as to his hands and arms. Goff's affidavit testimony is that his "few quick open handed strikes ... made contact with the side and top of Terry's head and with Terry's hands and arms which were raised to the level of Terry's head." The court asked Goff why he gave such testimony in his affidavit if he now contends such blows were impossible. Goff replied, "I don't remember hitting him on the top of his head, but if it's in there (the affidavit), I must have." Goff also conceded that "a report should have been written" about the use-of-force incident.

### D. Deputy Trace Smith

Deputy Trace Smith, Jr. testified that he began working at the Medium Security Facility in May 2008, a few months before the August 2008 incident. Smith was nearby and watching when Deputy Goff, from two to three feet away from Plaintiff, counseled Plaintiff regarding the rules against gambling. Deputy Smith first testified that he did not recall that Deputy Goff used any derogatory or abusive language. He then admitted that Goff may have used a curse word or two, but no racial slurs. Finally, he testified that Goff had called Plaintiff a "stupid motherfucker."

Smith testified that, as Goff continued his remarks, Plaintiff sat forward from his reclined, seated position and reached out with open hands toward Goff, as if to grab Goff. Smith testified that Goff and Plaintiff were only two or three feet apart at the time, and Smith was standing about two feet to the right of Goff in the small isolation cell. Smith did not recall that Plaintiff said anything up to this point. Smith saw Goff apply three or four strikes,

at most, to Plaintiff, and all of them probably went to the left side of Plaintiff's head. Plaintiff's hands then went to his face, and he began to lean over onto the bed. Plaintiff did not request medical care, and Smith did not see any obvious injuries, but he did not examine the back of Plaintiff's head.

Plaintiff pointed out an inconsistency between Smith's hearing testimony and what Smith swore to in an affidavit filed in support of a motion for summary judgment. At the hearing, Plaintiff asked Smith if he had noticed the gambling. Smith testified that he did not, and that Goff had told him about the gambling. Smith's affidavit, however, includes testimony that "Appearer and Deputy Brian Goff noticed inmates in one of the dorms playing cards and using the cards to gamble ..." Smith offered the explanation that he probably did not notice the word "Appearer" when he reviewed the affidavit.

### E. Deputy Rusty Murray

Deputy Rusty Murray testified that he began working at the Bossier facility in 2005, and he had received no complaints against him regarding use of force. Murray testified that Plaintiff, having been stripped searched, was naked during the entire incident and was not being disrespectful or out of control. Deputy Goff ordered Plaintiff to sit with his arms behind him, and Plaintiff did so. Murray testified that he stood in the doorway to the cell, and the door was probably open. Murray was facing inside the cell, with Smith to his right, and Goff in front of Smith.

Murray testified at the hearing that he could not recall if Plaintiff had his back against the cell wall, but Plaintiff pointed out that Murray testified in his summary-judgment affidavit that he saw Plaintiff "lean forward from the wall." Murray estimated at the hearing that Goff applied two to three strikes. He testified in his affidavit that Goff applied "several quick open-hand strikes to the top and sides of Terry's head and to his arms and hands which were up to the height of Terry's head." Murray gave conflicting testimony at the hearing that he did not see any strikes hit the side of Plaintiff's head, and he did not recall any hitting the top of Plaintiff's head or Plaintiff's arms. Rather, Murray testified at the hearing that Goff's strikes landed to Plaintiff's left face or left shoulder area. He described the strikes as "open palm strikes" that took only 1 to 1.5 seconds. Murray heard Plaintiff claim that he had a brain tumor, so Murray checked the records but found no evidence of such a condition.

Murray testified that he considered Plaintiff's aggressive reaching toward Goff to be attempted simple battery on a corrections officer, which is both a crime and a major rule violation. (Battery on a police officer, when committed in a jail or other correctional facility, is a felony punishable by up to five years imprisonment. La. R.S. 34.2(B)(2).) Such a major violation requires a written report. Plaintiff asked Murray why none was written. Murray said it should have been, and he had no answer when asked why it was not done.

### F. Damages and Medical Evidence

Plaintiff testified that, when he returned to the dorm area, he saw in a mirror that the left side of his face was puffy, and he felt a little dot of blood on the back of his head.

Page 9 of 15

Plaintiff said that he later completed a medical request form, but he was never seen for that request. He admitted that he was later seen for other health complaints. Plaintiff conceded that an intake screening form completed in December 2008, a few months after the incident, included no complaints of headaches or wounds that might be associated with a use of force. Another screening form, prepared when Plaintiff was moved to Winn Correctional Center in February 2009, also included no complaint of headaches, but it did note high blood pressure. It was not until August 2009, a year after the use of force, that Plaintiff completed a sick-call form at Winn and first documented a complaint of headaches. Plaintiff noted on the form that he had been having headaches for three or four weeks. He admitted at the hearing that this was his first complaint to any medical staff regarding headaches. Plaintiff has been treated with Naprosyn, Flexeril, and other medications, and he has even been referred for a CT scan due to his family history of brain tumors.

LPN Jennifer McDaniel testified that she has worked at Bossier Parish Medium Security Facility for about six years, and she worked at the state prison before that. She was working at the jail, but not on duty, on August 17, 2008 at about 8:30 p.m. (the time of the incident). McDaniel testified that an inmate placed in administrative segregation after a use of force may request medical care. If medical staff is not on duty at that time, they can be called if needed. Nurse McDaniel explained that an inmate who wants medical care completes a form and delivers it to a deputy, who then puts it in a box for the medical staff.

Plaintiff asked McDaniel if she ever heard complaints from inmates that they tendered forms to deputies but did not receive treatment. McDaniel denied ever receiving such complaints.

Medical records from the facility reviewed by Nurse McDaniel showed that Plaintiff knew how to file a request for medical care, and he was treated for the presence of blood in his stool in July 2008 and a gastrointestinal complaint in October 2008. But there was no record Plaintiff made a request for care of cuts, bruises, or the headaches that Plaintiff asserts were caused by the use of force.

Dr. Russell Roberts of the LSU Medical Center, and who is Board Certified in Family Medicine, testified that he has been involved in medical clinics at the Bossier Parish jails as well as other area state and parish facilities. He covered the clinic duties twice a week at the Bossier jails, and he reviewed his records of care given Plaintiff during the relevant period. Those records showed that, before the use-of-force incident, Plaintiff was seen regarding blood in his rectum and a complaint of constipation. A gastrointestinal consultation was also recommended. An entry from October 2008, after the use of force, included a note that Plaintiff said his bleeding from the rectum had stopped. Plaintiff did complain of heartburn and indigestion at times. He refused a prescription for Zantac, but blood tests were ordered. Plaintiff made no mention of injury caused by a use of force.

Plaintiff alleges that the use of force has caused him to now suffer headaches. Dr. Roberts reviewed Plaintiff's Bossier Parish records and saw no complaints regarding headaches. He added that headaches caused by trauma would be expected to start fairly

promptly after the traumatic event. Records from Winn Correctional Center, where Plaintiff was transferred, indicated that Plaintiff did not complain of headaches until about 11 months after the use-of-force incident. Dr. Roberts said it would be "very difficult to tie a headache" to events that far in the past. Dr. Roberts testified that Plaintiff's blood pressure was once observed to be a little high while he was at the Bossier jail, but later testing was normal, so there was no diagnosis of hypertension.

**Analysis of the Force Claim**

The outcome of this case turns largely on an assessment of the credibility of the witnesses, which is common in such excessive force claims. If Plaintiff is believed, he was beaten by three deputies for no reason and subjected to a racial epithet. The deputies, on the other hand, all testify that Plaintiff violated the jail's rule regarding keeping his arms behind his back and reached aggressively toward Deputy Goff, which caused Goff to react instinctively by using a few open-hand strikes to end the aggression.

All of the key witnesses faced issues with regard to their credibility. Three deputies gave sworn testimony in their summary-judgment affidavits, but appeared in court and gave sworn testimony that differed from the affidavit testimony. Also, the deputies admitted that they violated policy by not filing a written report regarding the use of force. This can support a reasonable inference that deputies had a sense of wrongdoing and did not want their supervisors to know about the incident. The lack of any disciplinary charge or report against

Plaintiff because of his alleged physical aggression, which would possibly support a felony charge, is also suspect.

On the other hand, Plaintiff is a convicted felon, which certainly does not bolster his credibility. (The crime for which he was convicted was never mentioned at the hearing.) The court finds that Plaintiff plainly exaggerated when he described the duration of the incident. And there was no support for Plaintiff's claim that Deputies Murray and Smith used any force on him. Plaintiff was evasive when he avoided discussing whether he had admitted to Goff that he was gambling.

The court also finds no support for Plaintiff's testimony that he requested medical attention for injuries suffered in the incident or his claim that, several months later, he developed headaches because of the incident. The evidence suggest that the blows, while forceful, effective, and perhaps painful, did not leave any significant wounds or physical damage. The court also finds persuasive Dr. Roberts' testimony that it would be very difficult to tie the headaches to an incident that happened several months earlier. There is insufficient medical evidence or other evidence of any physical harm.

In the end, neither Plaintiff nor the deputies came across as entirely reliable witnesses. The undersigned finds, however, that the greater weight of the credible evidence favors the Defendants. There is no credible evidence to support the claim that Deputy Goff or the other deputies inflicted the kind of beating that Plaintiff describes. The court finds that Goff, alone, inflicted a few open-hand strikes to Plaintiff's head or upper body area.

The critical issue then becomes whether Goff was justified in the use of that force by Plaintiff reaching for him in an aggressive manner, or whether Goff applied the force simply for malicious and sadistic reasons. The evidence is somewhat close on this point. Goff admits that he was irritated, and he got in Plaintiff's face and called him a stupid motherfucker. This is the kind of situation in which one can envision an irritated (and inexperienced) deputy using force when it was not needed. However, all three deputy witnesses swore under oath that the force was used only because of Plaintiff's aggressive action. Plaintiff denies that he acted in such a manner but, as noted above, he suffers from serious credibility problems.

Plaintiff, as the party seeking recovery on a claim of excessive force, has the burden of establishing the requisite facts by a preponderance of the evidence. The evidence is close, but the court finds that Plaintiff did not meet his burden of proof with regard to the key facts in this case. Accordingly, a judgment should be entered for the three deputies.

**The Detention Center**

Plaintiff names as a defendant the Bossier Parish Medium Security Facility. "It is well established that a detention center is not a legal entity capable of being sued." Robertson v. Det. Ctr. Claiborne Parish, 2009 WL 3241561 (W.D. La. 2009). All claims against the detention center should be dismissed.

Accordingly,

**IT IS RECOMMENDED** that all remaining claims against the remaining Defendants be dismissed with prejudice.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of October, 2010.

                                                  MARK L. HORNSBY
                                      UNITED STATES MAGISTRATE JUDGE